# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-22-00287-CR

---

**Michael Gonzalez, Appellant**

**v.**

**The State of Texas, Appellee**

---

### FROM THE 35TH DISTRICT COURT OF MILLS COUNTY
### NO. 3519, THE HONORABLE MIKE SMITH, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellant Michael Gonzalez was convicted by a jury of aggravated assault with a deadly weapon against Tammie Duffy, a person with whom he was in a dating relationship. *See* Tex. Penal Code § 22.02(a), (b)(1)(A). Following a hearing on punishment, he was sentenced to seventy years' confinement. In 13 issues, he contends that the trial court erred by: (1) admitting 33[1] photographs depicting Tammie's injuries; (2) admitting evidence of hospital staff's "emotional or mental" reactions to the injuries; (3) requiring defense counsel to use a hypothetical when cross-examining a witness for the State; (4) not permitting defense counsel to cross-examine the grand-jury foreman about burdens of proof; (5) admitting evidence of extraneous offenses committed by appellant; (6) excluding evidence of Tammie's drug use and criminal history; (7) admitting improper lay-opinion testimony; (8) admitting hearsay statements;

---

[1] Although appellant asserts that the trial court admitted 32 photographs, 33 were in fact admitted—State's exhibits 45 through 77.

(9) allowing a witness for the State to testify about matters of which she lacked personal knowledge; (10) admitting evidence of items seized in violation of the Fourth Amendment; (11) admitting an irrelevant and unfairly prejudicial jail call; (12) instructing the jury on the law of parties; and (13) allowing the State in its closing argument to comment on appellant's failure to testify. We will affirm the trial court's judgment of conviction.

## BACKGROUND

Appellant was charged by indictment with causing serious bodily injury to Tammie, a member of his household or a person with whom he had a dating relationship, "by using blunt force of a source unknown to the grand jury"; "striking her with his hand, foot, or some other object unknown to the grand jury"; or "forcibly causing her to ingest hair." The indictment also alleged that appellant used or exhibited a deadly weapon during the offense.

At trial, Tammie testified at length about her relationship with appellant. He had seen her profile on Facebook and begun messaging her. The two met in mid-July 2020 and began dating. Their relationship worsened in August of that year, however, when he "tore up [her] entire bedroom . . . in a fit of rage" after losing his phone. She nevertheless began staying with him at the end of the month, and he became physically abusive. He would also verbally abuse her, control her communications with friends and family, force her to take time off of work, isolate her, break her phones, and physically prevent her from leaving. She moved into his family's home in October, but the couple soon got their own duplex apartment in Goldthwaite on November 1st.

Following the move, appellant started going out more and became "more obsessive, jealous, [and] constantly accus[ed her] of messaging somebody else." He made her

delete her Facebook account, demanded that she remove or cover-up a memorial tattoo of a deceased ex-boyfriend, and beat her if she mentioned her exes. Around their apartment, he placed statutes of Santa Muerte,[2] which he said was his "god." Shortly after they met, he had told her that he worshipped Santa Muerte, that she needed "blood sacrifice," and that "somebody had been murdered and their blood had to be spilt over her."

Tammie and appellant would smoke marijuana together, and he also used methamphetamine, cocaine, and prescription medication. Although she tested positive for marijuana following the alleged assault, she testified that she last used it three days before the incident. In addition, she had been prescribed Xanax for anxiety, and appellant would confiscate her pills. In the week before the alleged assault, his drug use "was becoming heavy," and he was mixing cocaine, Xanax, and alcohol. The night before the incident, he drank, used cocaine, and smoked marijuana; the following morning, he again used cocaine and "popped some of the Xanax."

Tammie testified about the events of November 20th, the day of the alleged assault. Appellant began texting her from work around 6 a.m., but she was asleep and did not respond. His texts became increasingly ugly and threatening, and he accused her of being unfaithful. The two argued by text and call throughout the day. Around 2 or 3 p.m., she started reaching out to various family members, asking them to give her a ride to Brownwood because she was afraid. Although she had a vehicle, she did not drive herself and could not explain her decision not to do so.

---

[2] Although Tammie referred to "Santa Muerta" in her testimony, the religious icon's proper name is Santa Muerte. *See* Mixcoatl Miera-Rosete, *Officers at the Gate: Why United States v. Medina-Copete Should Be the Rule and Not the Exception*, 47 N.M. L. Rev. 184, 192 (2017).

In their text exchange, photographs of which were admitted at trial, Tammie—who testified that she had been diagnosed with depression and anxiety and was suffering a "mental episode" that morning—accused appellant of cheating in turn; told him that he was not "movin' nowhere"; threatened to destroy photographs of his mother, who had recently passed; and sent him a photograph of approximately 40-50 antidepressant pills with the text, "You think that's enough?" She explained that she had not been contemplating suicide but wanted only to make appellant feel bad. She also explained that he had previously thrown her deceased ex's belongings in the trash and that while she had threatened to destroy appellant's photographs, she would not have done so but was trying only to upset him.

Appellant responded by telling her that he "was faken . . . all along" and insisting that Tammie could not force him to stay or to be with her. He told her that he would have his teenage niece pick up his belongings, but Tammie replied that she would only give them to him. When she later attempted to call him, he did not answer but texted, "I aint doin shit my santa muerte is."

Appellant's coworkers dropped him off at his family's home, and he drove to the apartment with his niece. At around 6 p.m., he "busted through the door, had beers in his hand, [and was] cussing" at Tammie. She told him that they were not going to argue in front of his niece, so he drove the teen back to his family's home, returning to the apartment approximately 10 minutes later. He continued to cuss at and threaten Tammie, and, when she sat on the couch, he kicked her in the mouth with a steel-toed boot. Knowing that it would be "a way to boil his blood," she threw one of his Santa Muerte statutes onto the floor, smashing it and causing him to "spiral[] out of control" and become "very, very angry."

4

While he was hitting and yelling at her, her anxiety was "through the roof," and she grabbed a bottle of Xanax from a nearby table and took up to 15 pills. She testified that she was not trying to commit suicide but that the dose was five times her normal daily amount, that Xanax is a sedative, and that she can usually sleep after taking one pill.

She went to the bedroom and attempted to call 911. Appellant slapped the phone out of her hand, but she picked it up, dialed again, and does not remember "anything after that." She testified that her memory "cut[] off" approximately 15 to 20 minutes after she took the Xanax and that she has only "flashes" of memory: of appellant hitting her with his fists on her head, face, and body; of appellant's brother, Edward, and Edward's girlfriend, Daniela; and of trying to cover herself. She also testified that she believed that the memory loss resulted from her "brain blocking out the trauma" and from the Xanax.

Her next memory was of waking up in the ICU. She did not have any hair, had a new scar across her memorial tattoo, and had undergone bowel surgery. Appellant later told her that he had cut off her hair with a "razor knife."

She communicated with appellant for a few months following the assault and at one point submitted an affidavit of non-prosecution asking that the DA's Office dismiss the charge against him. At trial, she testified that he was "in [her] head again . . . [w]ith his controlling, aggressive, abusive stuff" but that she was able to "break completely away" from him on July 3, 2021, when he told her that he remembered everything and did not regret any of it. In her affidavit, she averred that she did not believe that he had intended to harm her and that "some of the injuries were due to [her] own actions." She testified that she no longer wanted the charge dismissed and that she had no doubt that appellant assaulted her.

5

Killeen Police Department (KPD) Detective Tim Koellner testified about Tammie's arrival at Advent Health Hospital in Killeen at approximately 8 a.m. on November 21, 2020.[3] He was working off-duty as a security guard at the hospital when he was told that an apparent assault victim, who was unconscious and whose hair was "real[ly] choppy and different lengths," had been dropped off at the ER by a man driving a Chevrolet Camaro; that the man had moved the Camaro to the hospital's parking lot; and that he had then gotten into a truck with two others and left. Koellner was also told that the man appeared to be Hispanic and had face tattoos. Later, a nurse informed Koellner that someone was calling about the patient. He answered the phone, and the caller—who identified himself as appellant—stated that he was checking on his girlfriend, that she had taken Xanax and "freaked out," and that he had to defend himself. Koellner asked appellant to return to the hospital, but he replied that he was on his way to work and would need to check with his boss. When asked why he had passed another hospital on his way to Advent Health, appellant answered that Tammie had requested to go there. Koellner testified that he did not believe that she was in a condition to have done so.

Dr. Alexander Barrero, the ER director at Advent Health, testified about his treatment of Tammie and professional opinion of her injuries. He first became aware of her arrival when he heard nurses shouting that they had an unresponsive person in the parking lot. He ran to assist and observed Tammie under the drive-through awning by the ER's front entrance. She was wearing only underwear and was being assisted from the passenger's side of a vehicle by hospital staff. A man standing by the driver's side of the vehicle told Barrero that Tammie had overdosed on Xanax and asked him to save her life. The man looked Hispanic and

---

[3] Koellner testified that Tammie was dropped off at the hospital on November 20th. However, hospital records admitted at trial reflect that it was actually the 21st.

had tattoos "everywhere on the face and neck." Tammie, who was unconscious, was wrapped in a sheet and placed in a wheelchair.

From the outset, Barrero decided to "approach this as a trauma" because Tammie had "black eyes and bruising throughout her body." While trying to intubate her, he discovered a large clump of hair deep in her trachea. The mass was about the size of a gumball and looked "like it was rolled up, and it was stuffed down." Barrero testified that he does not believe such an injury could have been accidentally inflicted, that there had been no vomit indicating that Tammie had inflicted the injury herself, and that the injury created a substantial risk of death and caused the protracted loss or impairment of a bodily function. After removing the clump, he noticed that "chunks" of Tammie's hair had been chopped off.

By this time, Barrero had formed the opinion that "it was a domestic abuse case . . . [a]n assault." He looked for internal bleeding, which he would not have done had he suspected a Xanax overdose, and observed that Tammie had blood in her abdomen and trauma to her small bowel; there was also bruising to the top of her abdomen just above her belly button. He testified that the abdominal injury likely resulted from high impact trauma like being kicked or falling down stairs. He was unable to say what kind of object had caused the injury, which like the hair, created a substantial risk of death and caused the protracted loss or impairment of a bodily function. In addition to the abdominal injury and clump of hair in her throat, Tammie had two black eyes; bruising on her bottom lip, chin, jawline, neck, back, buttocks, and legs; a "strangulation-type mark" around her neck; abrasions along the buttocks "with pieces of gravel in [them] from possibly being dragged"; what appeared to be a metal nail in her left ear canal;

7

petechiae[4] around her eyes; and hemorrhaging in both eyes from strangulation or "from a high impact punch or falling or something of that nature." Barrero testified that he had never seen falling cause injuries of that extent and that he had seen such bruising in car accidents. Photos of the injuries were admitted, which he testified were "good samples to understand the injuries that she received."

On cross-examination Barrero testified that Tammie's "breasts were out" but that he could not remember what she was wearing on her lower body. He testified that there was redness and bruising to the back of her throat indicating "forcible entry" and that were she to have swallowed her own hair, it would not have gone into her trachea. He also testified that the extent of her bruising could only have been caused by a car wreck or assault, that she had marijuana and benzodiazepines (benzos)—such as Xanax—in her system when she arrived at the hospital, that the object in her ear was possibly an earring, and that her injuries had to have been recent. He explained that the effects of benzos are respiratory depression, somnolence, exhaustion, drowsiness, memory loss, and not being able to protect one's breathing.

On redirect, he testified that Tammie's injuries could not have occurred from one fall but only from multiple falls from a height. He also testified that her consuming benzos and marijuana would have made self-injury less likely, that taking Xanax could have caused her not to remember some of the assault, that his professional opinion is that her injuries resulted from nonaccidental trauma, and that her abdominal bleeding had been caused within the last 12 hours. Over defense counsel's objection, he further testified that the extent of her injuries affected him

---

[4] A petechia is a "minute reddish or purplish spot containing blood that appears in skin or mucous membrane as a result of localized hemorrhage." *Petechia*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/petechia (last accessed October 24, 2023).

for a few weeks and that one of the hospital's nurses cried for an hour and a half, resigned from the hospital that day, and decided to take a break from nursing.

On recross, Barrero testified that Tammie's injuries could have been caused by falling down stairs. When shown the texted photograph of pills, he testified that he did not know what kind of pills they were but that hypothetically, someone who took them could become drowsy, stumble, and not be in their right state of mind.

Dr. Kevin Waldrep, a trauma surgeon at Baylor Scott & White (BS&W), likewise testified about his observations, treatment, and professional opinion of Tammie's injuries. She had "significant bruising" on all of her extremities and a mark around her neck that he was concerned could be a "strangulation mark." Although a CT scan revealed no evidence of injury to her solid organs, there was "a lot of blood" in her abdomen. She had a "bucket handle injury" to her small bowel, which involves the disconnection of blood supply to the bowel and required resection surgery. Bucket-handle injuries require a high-force mechanism, such as a high-speed car accident; Waldrep had never seen someone inflict that type of injury on themselves. Without the surgery, the injury—which he described as a "pretty serious bodily injury"—would have created a substantial risk of death or caused a protracted loss or impairment of the function of a bodily member or organ.

He testified that there was no evidence that Tammie inflicted her injuries on herself and that it "doesn't make much sense" for the hair to have become lodged in her trachea had she been trying to swallow it. From the totality of her injuries, he concluded that "they were inflicted on her or nonaccidental trauma or assault." To cause the injury to her abdomen, she would have had to "run and try to impale [her]self on something at a perfect angle, which . . . doesn't seem likely." In his experience, someone falling or stumbling while walking

9

could not inflict Tammie's injuries, and it "doesn't seem likely at all" that falling down stairs could have caused the bucket-handle injury and extensive bruising. Although internal bleeding could be caused by "a perfect shot" when falling down stairs, it would be less likely for a heavier person such as Tammie to sustain such an injury, and he could not see "any realm" in which her injuries were self-inflicted or the result of an accident.

Waldrep testified that Tammie tested positive for benzos, that Xanax would have made her relaxed and very sleepy, and that he "can't imagine causing that sort of injury to yourself after taking a bunch of Xanax." When shown the texted photograph, he testified that there appeared to be two types of pills; that he did not know what they were; and that if they were benzos, they would have a "pretty significant impact" on one's body "and the way that it's functioning." He further testified that he has never seen someone be stimulated by benzos and that as the body absorbs a large amount of such drugs, an individual would become "more sedated and less likely to do anything physical at all." He testified that someone who overdosed on benzos could be affected mentally. Asked if someone who fell repeatedly while overdosing on benzos could suffer "multiple bruising on the body," he testified that such a person "may fall once" but would "probably end up staying on the floor and not getting up multiple times."

When asked whether someone prescribed benzos would be suffering from "some sort of a mental episode," he testified that "in general, anxiety is mental, yes" but that "mental" is "not even a medical term" and that there should not be a negative connotation associated with a Xanax prescription. Defense counsel again showed him the photograph and asked whether, hypothetically, a person who texted the photograph together with "Do you think that's enough?" "might be dealing with something mentally." Waldrep responded that he did not know what the pills were or what was meant by the text and that he could not answer the hypothetical.

10

KPD Detective Ramiro Martinez, the case's lead investigator, testified about his observations of Tammie at the hospital and his search of the Camaro. He arrived at Advent Health at approximately 9 a.m. on November 21, 2020, and saw that she was unconscious and had swollen eyes, injuries to her shoulders and arms, and facial injuries that were consistent with trauma. Her hair appeared to have been chopped off as though "the intent was to cause harm or humiliation." Martinez testified that he had "been involved in cases where a spouse, husband, boyfriend, will grab the lady by the hair, cut it, because—you know, to, I guess make them feel unpretty, pull wigs, pull braids, patches of hair out." He was told by hospital staff that when Tammie was brought in, her pants were down around her knees, and there was dirt or sand in her vagina.

After speaking with Tammie's family, Martinez learned that the Camaro was hers. Inside the Camaro, he found sand matching that seen on her as well as two documents with appellant's name on them in the backseat. He was able to obtain a copy of appellant's driver's license photo, and hospital staff believed that appellant was the man who dropped off Tammie.

Tammie's sister, brother, and children testified about the family's structure and their communications with Tammie on November 20th and 21st. Her daughter, E.D.,[5] testified that prior to the alleged offense, she moved out of Tammie's apartment and into her father's home. Tammie's relationship with appellant was part of the reason E.D. distanced herself from Tammie. On November 20th, Tammie sent E.D. a text asking for a ride to Brownwood "as soon as possible." E.D. attempted to reach her two hours later, but Tammie did not respond to repeated calls and texts. E.D.'s phone indicated that her texts to Tammie were not being

---

[5] Because E.D. was a minor at the time of the alleged offense, we will refer to her by her initials in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

delivered. The following morning, she received the text, "She's asleep. I'll have her call you when she wakes up." When E.D. tried to call Tammie, the calls would go unanswered, but someone would reply with texts.

Tammie's son Jordan likewise testified that the day before the alleged assault, Tammie texted him that she was not happy and wanted to move back to Brownwood. He responded that he would help her move when he got off work, but he did not see her again until she was in the hospital. After she was discharged, he went to her apartment and saw that "[e]verything was shredded to pieces"—including vaccination records, birth certificates, and family obituaries—and that someone had written "you fat fucking whore" on the TV. He testified that Tammie struggled with anxiety and depression.

Another of her sons, Austin, testified that he received a text from Tammie in November 2020 asking for help moving back to Brownwood but that he was not able to help her at that time. When he went to her apartment the next day, no one was there, and it was locked. On cross-examination, he testified that Tammie was dealing with "mental issues" but that he was not aware that she had overdosed on Xanax.

Tammie's sister, Melissa Woodward, testified that she called Tammie around 2 p.m. on November 20th and that Tammie told her that she was trying to get her sons to help her move back to Brownwood because she knew appellant was "gonna tear [her stuff] up." Later that afternoon, Melissa missed a call from Tammie, and when she tried to call her back, Tammie's phone was turned off. At approximately 10 p.m., Melissa called Goldthwaite police and asked them to conduct a welfare check on Tammie. Melissa was told that an officer had seen Tammie's car at the duplex and that the apartment's lights were on but that no one had answered the door.

12

On the morning of the 21st, Melissa called appellant's phone, and he told her that Tammie was asleep. When Melissa insisted that she be allowed to talk to her sister, appellant stated that that she had taken a bunch of pills, that she had not spoken for hours, and that she was "just staring into space and not saying anything." When Melissa told him to call an ambulance, he "instantly" stated that Tammie "did it all to herself." However, he then said that she was in an ambulance and that he was following her to the hospital. He would not tell Melissa the name of the hospital or ambulance company, claimed to be following the ambulance for over an hour, and repeatedly hung up on her.

Tammie's brother, David Woodward, testified that he called appellant after speaking with Melissa and that appellant told him that Tammie was "laying there with her eyes open" and could not talk. Appellant also stated that Tammie had taken a full bottle of Xanax and had torn a photograph of his mother, about which he sounded more upset. David told him to take her to a hospital and was "a hundred percent convinced" that his phone call was "part of the reason why [appellant] actually" did so. When asked on cross-examination whether he was aware that Tammie was dealing with "some mental issues at the time," David testified, "I would say we all deal with mental issues."

Renee Hamilton, a former sexual assault nurse examiner (SANE) at BS&W, testified that she was present for a sexual assault forensic examination (SAFE) performed by Elizabeth Gault, who was not available to testify at trial. Tammie was not conscious during the exam, which took longer than normal to complete because of the extent of the injuries.

Hamilton and Misty Bennett, another SANE, performed a second SAFE after Tammie regained consciousness. Hamilton testified that Tammie had a "sporadic" and "almost nonexistent" memory, which resulted from what she termed "the trauma brain": the release of

13

cortisol during a traumatic event, which stops the formation of memory as a protective mechanism. During the exam, Tammie touched her head, realized that her hair had been cut, and asked whether it had been done by hospital staff.

Hamilton testified about the results of the second SAFE. Tammie had petechiae in the back of her throat, a linear pattern of bruising on her neck, and hemorrhaging in her eyes, all of which are consistent with strangulation. She also had bruising to her right inner arm as if someone had grabbed her by the arm and pulled her; a pattern injury to the right hip area that looked like a shoe; large skin abrasions to the back and buttocks consistent with dragging; bruising to her belly consistent with the heel of a foot; and a laceration over the tattoo on her chest. Hamilton testified that "there [were] well over 200" injuries to Tammie.

Tammie described to Hamilton appellant's exhibiting "control and patterns of control," including alienating her from her loved ones, which Hamilton explained are "signs of [an] abusive relationship." Hamilton testified that abusers commonly exert control, that it is common for abuse victims not to leave a partner, and that many victims recant or seek to have charges against their abusers dropped. Tammie told her that she had gotten into a fight with appellant "over some statues." When asked "who did that to her body," Tammie replied that she "knew it was [appellant] and his brother." She said that appellant had hit her in the face before and had emotionally abused her and called her names. She also told Hamilton that she could leave but had not tried to do so, that appellant had deleted contacts from her phone, and that he had a way of tracking her location.

On cross-examination, Hamilton testified that Tammie also stated that her body was not "like this when we took off" and that she "wasn't like that when we left." Tammie also told her that it did not "get physical" when she and appellant were arguing; that he calmed down

14

after the argument over the statue, and she and appellant left for Killeen; that he did not apply pressure to her throat; that she did not remember anyone touching her body; that no pressure was applied to her neck; that she did not believe that she was strangled; and that she was not touched on her neck in a manner that made it hard to breathe.

On redirect, Hamilton testified that it was her opinion that Tammie "just wasn't able to recollect what happened during the assault" and that her denials resulted from trauma brain. She also testified that the medical evidence supported a conclusion that Tammie was assaulted and that based on that evidence, she had no doubt that the assault occurred.

Misty Bennett similarly testified about Tammie's injuries and second SAFE. Her injuries consisted of a bucket-handle injury, two pattern injuries indicative of a shoe or boot print to her hip and side, a ligature mark, and petechiae consistent with strangulation or suffocation. The injuries created a substantial risk of death. Tammie's memory was not intact, which is "fairly normal" because "[i]t's very common for victims to not have memory of the events that happened to them or have lapses in memory. Some don't even remember the majority of the assault." In Bennett's professional opinion, Tammie was incorrect when she stated that she had not been strangled, that no one had hurt her by touching her, and that no one had impeded her breath by touching her. Rather, Tammie's understanding of what happened "was related to being in a significant stressor and trauma situation." Bennett did not think the statements were lies but did not think "you can rely on the outcry being so soon after the assault." She testified that her medical opinion was that Tammie was assaulted by another person using an unknown weapon in a manner capable of causing death and that caused prolonged impairment of the use of a bodily member or organ.

15

During the second exam, Tammie told Bennett that she remembered being at home, and "[t]hen they said [she] was in Killeen"; that she remembered getting into a car to go to Killeen, and her body felt fine; that she remembered arguing with appellant while they were alone; and that she broke appellant's statue, and he was upset with her. She also related that she was only allowed to have contact with family, that her phone contacts were deleted, and that she was not allowed to leave the apartment. Bennett testified that appellant's reported behavior was "[p]art of intimate partner violence" and "very much manipulation tactics to control the partner."

Bennett also testified that Tammie's injuries would be consistent with having been inflicted by someone "who had reached a manic stage after using cocaine." When asked if her opinion would change if appellant had used both cocaine and Xanax, she testified that it would depend on the order in which the drugs were taken. If he used Xanax and then cocaine, she would expect to see a mania afterward. In the reverse, "he would go down quicker," and she "probably wouldn't see the mania." If the cocaine were ingested in the morning and the Xanax in the afternoon, he would be "more chilled that afternoon."

Teresa Padilla, Tammie and appellant's neighbor, testified that she went to work around 6:30 a.m. on November 20, 2020, and noticed that the couple's living room lights were on, which was unusual. When she returned home at approximately 4:30 p.m., a Hispanic male and Hispanic female—in her early or mid-20's—were at the duplex. Padilla saw Tammie through the screen door and observed two vehicles at the residence: a tan SUV and a black Camaro. Before going to bed, Padilla heard appellant yell, "Where is it? Where is it," and heard Tammie yell, "I don't know." She never heard a "physical fight" and would have heard any altercation through their shared wall. When she awoke on November 21st around 4:30 a.m., there were no vehicles at the couple's apartment, but it appeared that a TV was on. Padilla

16

testified that she was not aware that police recovered broken items or cuttings of a woman's hair from inside the home and that she did not want to come to court or be involved.

Mills County Sheriff's Office (MCSO) Deputy John Fincher testified about his identification of appellant, the search of Tammie and appellant's duplex, appellant's apprehension, and his interview of appellant. Fincher had previously investigated concerns for Tammie's safety. When Detective Martinez told Fincher that the men who dropped off Tammie were covered in tattoos, Fincher—who knew that Tammie was in a dating relationship with appellant and that appellant and his brother Edward have face tattoos—told Martinez that he believed that it was the brothers. He provided Martinez with their mugshots, which "made it possible to identify them."

It appeared from the search of the apartment that a "violent altercation" had occurred in the living room. He observed soil from a potted plant strewn about the floor, torn papers and pills scattered around, and cut hair on the floor. Officers discovered blood in several locations around the apartment: in the master bedroom, on envelopes and clothing, smeared on a towel hanging on the master bedroom door, on a mattress, and on a sheet where it was mixed with "some other type of bodily fluid." Hair was found in every room of the apartment, including a large clump at the bottom of a trash can. A TV in the master bedroom had "fat whore" scratched into its screen.

In a large "dumpster-style" trash can outside the apartment, officers located items that they believed were associated with the alleged assault, including more hair; scissors; a Ziploc bag containing hair that was labeled with the name of Tammie's deceased ex; pieces of broken colored glass matching other pieces seen in the apartment; ripped funeral programs for three of Tammie's relatives; torn photographs of her family; ripped pieces of her sister's death

17

certificate; a hard wooden object; Tammie's stepdaughter's ripped birth certificate; and "an entire photo album" apparently belonging to Tammie. Several of the items were marked or stained with apparent blood. From the items as well as trash bags and piles of sweepings in the apartment, Fincher testified that it appeared that someone had been trying to clean up the duplex.

Based on the evidence, officers concluded that appellant and his brother were fleeing. Edward was arrested at a South Texas border checkpoint. GPS tracking of appellant's phone was unsuccessful, and police learned that appellant had pawned an iPhone in a border town on November 28th. They recovered the pawned phone on the same day that appellant turned himself in in Hidalgo County; a second phone was found on him.

Fincher interviewed appellant on December 1st. Appellant stated that he and Tammie argued on November 20th, that she attacked him with keys when he walked through the door of their apartment, that she hit him on the arms and chest, that he defended himself by slapping and hitting her, that he punched her in the face, and that something involving his mother's photographs made him "lose it." Fincher noted that appellant had no visible injuries. Appellant stated that Tammie had been under the influence of Xanax during the entirety of the incident. He told Fincher that following the fight, appellant took Tammie to his father's home and left her on the bedroom floor because he could not get her into the bed. He stated that the next morning, she was still lying on the floor and was "moaning and kind of out of it." He stated that Edward and their sister Diana came to the residence and that he drove Tammie to the hospital in her Camaro while Edward and Diana followed in an SUV. According to appellant, Edward did not want to help him, so after dropping off Tammie, appellant got out of the SUV and walked to the house of a friend, who drove him to Houston. Appellant stated that another

18

friend gave him a ride from Houston to Hidalgo County. He also stated that he turned himself in to tell law enforcement that Edward was not involved.

On cross-examination, Fincher testified that although Tammie initially told him that she had been sexually assaulted, she later clarified that she had been told that information. He did not think that she was lying but rather that, owing to her impaired memory, she was merely repeating what she had heard. He testified that despite the statements made in her affidavit of non-prosecution, he did not investigate her for making a false statement to law enforcement. With respect to his investigation, he testified that officers did not test any hair or blood samples for DNA, that they did not test the scissors for fingerprints, that they never recovered a steel-toed boot, and that they never tested the torn documents for fingerprints.

On redirect, Fincher testified that Daniela Valencia, Edward's girlfriend, told police that after leaving the hospital she, appellant, and Edward went to appellant and Edward's brother's home in South Texas, that she took a photo of a palm tree, that Edward got angry and removed her phone's SIM card, and that he and appellant also removed the SIM cards from their own phones and burned them with a torch.

Keith Brooks, the foreman of the grand jury that indicted appellant, testified that an officer told the grand jury the information known to him but explained that officers were uncertain of the manner and means of the alleged offense. As a result, the indictment returned by the grand jury included language that certain facts were unknown to it. The indictment's language reflected the information known to officers when they presented evidence to the grand jury. Brooks testified that the burden of proof to indict is whether the grand jury feels that there is "enough evidence to bring it to court." When asked by defense counsel where probable cause

"ranks as far as the burden of proof goes," Brooks testified, "[I]f we believed it was enough evidence to bring it to trial, but we w[ere]n't the ones doing the trying."

MCSO Chief Deputy Chris Green testified about a jail call between appellant and Tammie made following his arrest for the charged offense. Green testified that on the call, appellant and Tammie discussed the indicted offense, that appellant several times stated that he had no regrets about what he did, and that he did so even as Tammie listed various acts of violence committed against her. On cross-examination, Green testified that appellant "never admits to doing anything" but says only that he has no regrets for what he did. He also testified that there was no context for appellant's references.

Appellant's niece, A.P.,[6] testified for the defense about the events of November 20, 2020. She had been on Thanksgiving break and spent the night of the 19th at the duplex. On the morning of the 20th, appellant left for work, and she called her grandfather to pick her up. Around lunchtime, appellant texted her and asked her to pick up his mother's photographs from the apartment. Her grandfather drove her, but Tammie would not open the door, so they returned to her grandfather's home. That afternoon, appellant came home from work and drove her once more to the apartment. When they entered, Tammie was in the kitchen and began yelling at appellant. He tried to enter their bedroom, but Tammie kept him from doing so. A.P. also tried to go into the bedroom, and Tammie pushed her into the living room and then outside. She did not see Tammie or appellant hit each other and did not hear "any sort of physical fight." Outside the apartment, she heard appellant say, "Where was – where is it, where is it?" Appellant left the home crying and drove her back to her grandfather's.

---

[6] Because A.P. was a minor at the time of the alleged offense, we will refer to her by her initials in the interest of privacy. *See* Tex. R. App. P. 9.10(a)(3).

20

That night, appellant asked her and her grandfather to return to the apartment with him. Appellant and her grandfather escorted Tammie—who appeared tired and intoxicated—from the apartment. She could not talk or move her feet, and appellant and A.P.'s grandfather were carrying her. Tammie did not appear to have any injuries, and her hair was not unusual. However, she fell twice down the stairs at the apartment, and the first time she fell face-first onto the ground. After arriving at A.P.'s grandfather's house, Tammie again had a "hard fall" on the stairs there and hit her stomach on "the pointy side of the stairs." She fell a fourth time in the living room and hit her head against the edge of the TV stand. Appellant and A.P.'s grandfather carried Tammie into the bedroom.

On cross-examination, the State questioned A.P. about discrepancies between her trial testimony and statements made during an interview with police on December 4, 2020. A.P. testified that she did not tell the interviewing officers that Tammie fell because she was confused about what was happening, did not remember everything, and did not think that she was going to be interviewed. She testified that she "[p]robably" remembered what happened back then but that she remembered better at trial and that her memory had improved over the intervening year and a half. She testified that she did not remember telling officers that Tammie's hair had been chopped off when she arrived at A.P.'s grandfather's house.

Diana Gonzalez, appellant's sister, testified during the defense's case-in-chief about what occurred after she was called to her father's house on the morning of November 21st. When she arrived, appellant was attempting to wake up Tammie, who was slumped on the couch and was "highly intoxicated." Tammie did not appear injured but would not respond to her. Diana and appellant tried to help Tammie up, but she collapsed onto her knees and could not stand. Diana told appellant that she could not help him and had to go to work.

21

On cross-examination, Diana testified that Tammie's hair had been chin- or shoulder-length but was short that morning. She did not notice that Tammie's hair had been chopped or hacked off. She testified that like Tammie, appellant had no visible injuries or marks. However, she also testified that she remembered telling officers that Tammie's lip was swollen and that she was moaning. She testified that after taking Tammie to the hospital, appellant went to work with their brother in Edinburg. She did not know if Edward went with him.

The State called Fincher again as a rebuttal witness to testify to contradictions between A.P.'s and Diana's statements in their interview with him and their trial testimony. In the interview, A.P. never indicated that she spent the night of the 19th with Tammie and appellant, never told him that she observed Tammie fall multiple times, and never alleged that Tammie pushed her. A recording of the interview was admitted, in which A.P. stated that she noticed that Tammie's hair had been cut off, that Tammie had asked appellant if A.P. could leave the apartment during their argument, that appellant had been the only one to help Tammie walk out of the apartment, that she hit her head once on the car door, and that A.P. observed light bite marks on appellant's arms. On the recording, Diana stated that Tammie's lip had been swollen on the morning of the 21st, that she could still open her eyes a little, and that it was clear that she needed to go to the hospital.

The jury convicted appellant of the charged offense. Following a hearing on punishment, it sentenced him to 70 years' confinement. This appeal followed.

22

## DISCUSSION

### I. Admissibility of Hospital Photographs

In his first issue, appellant contends that the trial court erred by admitting 33 photographs depicting Tammie's injuries "in violation of [Texas Rule of Evidence] 403." *See* Tex. R. Evid. 403. He argues that "[b]ecause the balancing test was conducted without the necessary facts before the trial court for each exhibit or group of exhibits, the balancing test was applied improperly when it was applied to thirty-[three] photographs with differing factual predicates for each photo." Citing *Distefano v. State*, he concludes that "because the exhibits contained differing scenarios and fact patterns, the admission of thirty-[three] exhibits without facts from the supporting witness and different predicates for introduction constitutes reversible error." *See* 532 S.W.3d 25, 38 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd).

We review a trial court's decision to admit evidence for an abuse of discretion. *Henley v. State*, 493 S.W.3d 77, 82–83 (Tex. Crim. App. 2016); *see also Dabney v. State*, 492 S.W.3d 309, 316 (Tex. Crim. App. 2016). An abuse of discretion does not occur unless the trial court acts "arbitrarily or unreasonably" or "without reference to any guiding rules and principles." *State v. Hill*, 499 S.W.3d 853, 865 (Tex. Crim. App. 2016) (quoting *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990)). In other words, we may not reverse the trial court's ruling unless the "decision falls outside the zone of reasonable disagreement." *Johnson v. State*, 490 S.W.3d 895, 908 (Tex. Crim. App. 2016); *see also Henley*, 493 S.W.3d at 83. An evidentiary ruling will be upheld if it is correct on any theory of law applicable to the case. *Henley*, 493 S.W.3d at 93 (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

23

Rule 403 provides that a trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403. Evidence is unfairly prejudicial when it has "an undue tendency to suggest that a decision be made on an improper basis." *Montgomery*, 810 S.W.2d at 389. The rule favors the admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007). Under the rule, trial courts have "considerable freedom in evaluating proffered evidence's probative value in relation to its prejudicial effect," and there should be "a corresponding reluctance on the part of an appellate court to reverse trial court decisions which admit or exclude evidence." *Montgomery*, 810 S.W.2d at 378.

In conducting a Rule 403 analysis, the trial court must balance the claimed probative force of the proffered evidence along with the proponent's need for the evidence against:

> (1) any tendency of the evidence to suggest that the case would be decided on an improper basis; (2) any tendency of the evidence to confuse or distract the jury from the main issues; (3) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (4) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Henley*, 493 S.W.3d at 93 (citing *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006)). These factors may blend together in practice. *Gigliobianco*, 210 S.W.3d at 642. A trial judge need not conduct the analysis on the record; rather, by overruling a Rule 403 objection, he is assumed to have applied the balancing test and determined that the evidence was

24

admissible. *See State v. Mechler*, 153 S.W.3d 435, 444 n.8 (Tex. Crim. App. 2005); *Hitt v. State*, 53 S.W.3d 697, 706 (Tex. App.—Austin 2001, pet. ref'd).

When reviewing a trial court's decision to admit photographs over a Rule 403 objection, we may consider many factors, including: "the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or in black and white, whether they are close-up and whether the body depicted is clothed or naked." *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Crim. App. 2002) (citing *Wyatt v. State*, 23 S.W.3d 18, 29 (Tex. Crim. App. 2000)). We are not limited to this list, however, and should also note "[t]he availability of other means of proof and the circumstances unique to each individual case." *Id.* Photographs are generally admissible where verbal testimony about the same matters is admissible. *Jones v. State*, 944 S.W.2d 642, 652 (Tex. Crim. App. 1996). Moreover, a trial court "does not err merely because it admits into evidence photographs which are gruesome." *Paredes v. State*, 129 S.W.3d 350, 540 (Tex. Crim. App. 2004) (quoting *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995)).

Here, the trial court held a hearing on the photographs' admissibility outside of the jury's presence. After being shown the exhibits, Dr. Barrero, the ER director at Advent Health, testified that they fairly and accurately depicted Tammie's injuries as well as some of the medical interventions that he performed. When the State offered the exhibits for purposes of the hearing, defense counsel objected under Rule 403 that "the probative value is severely outweighed by any prejudicial value that these pose"; that the State was "clearly trying to pull on the emotional strings"; that the photographs were "cumulative" and "repetitive" of prior testimony; and that because Barrero could not testify to the injuries' cause, the photographs would "plant the seeds in these jurors' minds that this Defendant, Mr. Gonzalez, is the one that

25

did this offense." The State responded that any prejudice resulted from the severity of the charged offense, that the jury's hearing testimony concerning the injuries would be less effective than its seeing them, and that they were akin to a lab report in a drug case. The trial court, having reviewed the exhibits, ruled that "after conducting the balancing test required by law, the Court overrules the objection of the Defense and the State's Exhibits 45 through 77 are admitted."

The photographs were highly probative and depicted the extent of Tammie's injuries, including the ligature mark around her neck, her shorn hair and black eyes, the petechiae in and around her eyes, and the bruising to her entire body. The photographs' probative value was particularly strong in that defense counsel's principal argument at trial was that the injuries resulted from Tammie's accidentally falling, a theory contradicted by several witnesses through reference to the nature and extent of the injuries. Although Barrero testified to the photographs' contents and to Tammie's injuries more generally, his testimony did not render the photographs redundant. The State still had need for them as "powerful visual evidence, probative of various aspects of [its] theory of the offense including the brutality and heinousness of the offense." *See Sonnier*, 913 S.W.2d at 519. Relatedly, the Court of Criminal Appeals has held that "[t]he fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction." *Gallo*, 239 S.W.3d at 762.

To the extent that appellant asserts that the graphic nature of the photographs had the potential to confuse or mislead the jury, they "depict no more than the injuries inflicted upon the victim and are no more gruesome than the facts of the offense itself." *Sexton*, 51 S.W.3d at 616 (citing *Williams v. State*, 958 S.W.2d 186, 196 (Tex. Crim. App. 1997); *Sonnier*, 913 S.W.2d at 519). As the Court of Criminal Appeals has explained, "[W]hen the power of the visible

26

evidence emanates from nothing more than what the defendant has himself done[,] we cannot hold that the trial court has abused its discretion merely because it admitted the evidence." *Sonnier*, 913 S.W.2d at 519; *see Williams v. State*, 301 S.W.3d 675, 692 (Tex. Crim. App. 2009) (concluding trial court did not abuse its discretion because photographs "depicted both the crime scene and the victim's injuries" and "portrayed no more than the gruesomeness of the injuries inflicted by appellant"). Similarly, the number of photographs—which were in color, detailed, close-up, and depicted Tammie both clothed and partially nude—merely reflects the extent and location of her injuries.

Despite the number of exhibits, little time was spent on their presentation, which amounted only to eight pages of an approximately 1,000-page transcript of the guilt-innocence phase of trial. Moreover, although taken in a medical setting, they were not of such a technical or complex nature as to be given undue weight by the jury.

With respect to appellant's argument that the photographs' "differing factual predicates" rendered the trial court's balancing test improper, we note that the case to which he cites is inapposite and unsupportive of his conclusion. In *Distefano*, the defendant asserted that the trial court had failed to conduct a Rule 403 balancing test, insisting that a statement from the court indicated that it had not conducted the test "separate from its admissibility determination under article 38.37." 532 S.W.3d at 31. Our sister court found that the court's statement "merely show[ed] that the trial court considered and overruled [the defendant]'s objections under both Rule 403 and article 38.37" and that the defendant had not overcome the presumption that the court conducted the balancing test. *Id.* at 32. The court of appeals then weighed the *Gigliobianco* factors and determined that the trial court had not abused its discretion by admitting the challenged evidence. *Id.* at 34.

27

Thus, the trial court did not abuse its discretion by admitting the photographs. *See Henley*, 493 S.W.3d at 82–83. We overrule appellant's first issue.

## II. "Victim-Impact" Testimony

In his second issue, appellant contends that the trial court erred by admitting Barrero's testimony regarding the effect that Tammie's injuries had on him and a hospital nurse. Appellant argues that the testimony was irrelevant and constituted "impermissible victim impact testimony."

Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action. Tex. R. Evid. 401. Relevant evidence is admissible unless otherwise prohibited by the Rules of Evidence or constitutional or statutory law. *Id.* R. 402. "Victim impact" evidence is evidence of the effect of an offense on people other than the victim. *Roberts v. State*, 220 S.W.3d 521, 531 (Tex. Crim. App. 2007). The Court of Criminal Appeals has held that such evidence lacks "any tendency to make more or less probable the existence of any fact of consequence at the guilt stage of trial." *Miller-El v. State*, 782 S.W.2d 892, 895 (Tex. Crim. App. 1990).

The State asked Barrero if the "extent of Tammie's injuries significantly affect[ed] him] and the nurses that were involved in [her] treatment," and defense counsel objected that the question was irrelevant, that it did not concern Barrero's expertise, and that he was "not called to give his emotions on the witness stand." The State responded that the anticipated testimony would constitute evidence of serious bodily injury, and the trial court overruled the objection. Barrero testified that Tammie's injuries affected him for weeks and caused a travel nurse to give up nursing. He testified that the nurse cried in the bathroom for an hour and a half, told other

staff "how emotional it made her and how she has never seen anything this horrific or graphic in her life," and resigned that afternoon.

Appellant analogizes his claim to that in *Cantu v. State*, a death-penalty case in which the defendant objected that victim-impact testimony from the mother of the victim of an unindicted murder during the punishment phase was not relevant to the special issues and was more prejudicial than probative. 939 S.W.2d 627, 635–36 (Tex. Crim. App. 1997). The Court of Criminal Appeals held that the mother's testimony was irrelevant because the defendant "was not on trial for [her daughter's] murder and such evidence serves no purpose other than to inflame the jury." *Id.* at 637. However, the Court also determined that the error was harmless given the evidence's sparsity, the fact that it was not mentioned by the State during argument, and the overwhelming focus during the punishment phase on appellant's behavior and the circumstances of the offense. *Id.* at 637–38.

Although *Cantu* is distinguishable in part because the challenged testimony in that case occurred in the punishment phase and involved the victim of an unindicted offense, we nevertheless agree with appellant that the admission of Barrero's testimony regarding the impact of Tammie's injuries on hospital staff was error. Barrero testified in great detail about the nature and extent of Tammie's injuries, including that they posed a substantial risk of death and caused the protracted loss or impairment of a bodily function. *See* Tex. Penal Code § 1.07(a)(46) (defining "serious bodily injury" as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ"). How the injuries subjectively affected him or others who observed them did not make it more probable that they met the statutory definition of serious bodily injury. One may be strongly affected by an injury that does not threaten death or cause

29

disfigurement. Conversely, the fact that a healthcare professional remains personally unmoved does not mean that an injury is minor. The trial court therefore abused its discretion by admitting the testimony.

Having concluded that the testimony's admission was error, we must next determine whether that error was harmful. The erroneous admission of evidence is generally considered non-constitutional error, *Walters v. State*, 247 S.W.3d 204, 219 (Tex. Crim. App. 2007), which requires reversal only if it affects the substantial rights of the accused, Tex. R. App. P. 44.2(b); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011); *see also* Tex. R. Evid. 103 (stating that trial court error admitting or excluding evidence must affect "substantial right of the party"). A defendant's substantial rights are affected "when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In making this determination, the reviewing court "should consider everything in the record, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error and how it might be considered in connection with other evidence in the case." *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). The court "may also consider the jury instructions, the State's theory and any defensive theories, closing arguments and even voir dire, if applicable," as well as "whether the State emphasized the error." *Motilla*, 78 S.W.3d at 355–56. If the court, "after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect," then the defendant's substantial rights were not affected. *Id.* at 355 (quoting *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

The defense's principal theories at trial were that Tammie was not credible and that her injuries were either self-inflicted or caused by her falling repeatedly while under the influence of Xanax. The objected-to testimony, however, did nothing to undermine these theories as it included no assignation of blame for the injuries. Nor was the testimony emphasized by the State. Barrero was the only witness to testify about the injuries' effect on hospital staff, and the State did not mention the challenged testimony in its closing argument.

Insomuch as the testimony emphasized the gruesomeness and severity of the injuries, it did so no more than other evidence. *See Leday v. State*, 983 S.W.2d 713, 717 (Tex. Crim. App. 1998) (en banc) (noting that improper admission of evidence is not reversible error if same facts are shown by other evidence which is not challenged). The jury saw detailed photographs of each of Tammie's injuries, and physical copies of 11 of the photographs were circulated to jurors. Barrero, who testified about each of Tammie's injuries, also testified that they were consistent with a car accident or major trauma. Waldrep likewise testified that Tammie's abdominal injury was something most commonly seen in high-speed vehicle accidents. Multiple members of her family testified to their horror and shock on seeing her in the hospital.

Moreover, the evidence of appellant's guilt was overwhelming. *See Motilla*, 78 S.W.3d at 356–57 (evidence of guilt is relevant factor in Rule 44.2(b) harm analysis). The record reflects that after lying repeatedly to Tammie's family members about following her ambulance to the hospital, he dropped her off at the ER partially nude, fled to the border, and pawned his cell phone. Trash bags at the couple's apartment and items in a nearby dumpster suggested that someone had attempted to clean up evidence of a struggle before his flight, and "fat whore" was scratched into a TV screen in the apartment. Tammie's injuries included two

31

black eyes, a bucket-handle injury to her small bowel, pattern injuries to her hip and belly resembling a shoe or heel, a clump of hair forcibly lodged in her trachea, petechiae in the back of her throat and around her eyes, a ligature mark around her neck, drag marks to her buttocks, bruising to her entire body, hemorrhaging in her eyes, a nail-like object in her ear canal, roughly-shorn hair, a laceration across the memorial tattoo on her chest, and dirt or sand in her vagina. Both Barrero and Waldrep testified that they believed the injuries to be consistent with, and the result of, assault; that Tammie appeared to have been strangled; that the injuries were too severe to have been caused by falling; and that they could not all have been self-inflicted. The defense offered no convincing explanation for the evidence that Tammie was strangled and kicked or that hair had been shoved down her throat. She testified extensively about appellant's history of violence toward her and about his controlling and abusive behavior. She also testified that he used drugs on the day of the alleged assault; that he sent her threatening texts; that he kicked her in the mouth with a steel-toed boot; that he became enraged when she broke his Santa Muerte statute; that she remembered him hitting her face, head, and body with his fists before her memory "cut[] off"; and that he later admitted to cutting off her hair. Further, a jail call was admitted into evidence in which appellant repeatedly stated that he regretted nothing as Tammie questioned him about the assault.

For these reasons, the admission of Barrero's testimony regarding his and the nurse's reactions to Tammie's injuries was harmless error. We overrule appellant's second issue.

32

## III.    Mental-State Hypothetical

In his third issue, appellant contends that the trial court erred by requiring defense counsel to use a hypothetical question when cross-examining Dr. Waldrep "regarding the effect of ingesting dozens of benzodiazepine pills on Ms. Duffy's mental state."

During a pretrial hearing, the trial court admitted an exhibit consisting of 21 photographs of a November 20, 2020 text exchange between Tammie and appellant recovered from appellant's phone. The exchange documented an argument between the couple, in which they traded insults and accused one another of being unfaithful. Tammie stated that appellant was not "moving nowhere" and sent him a photograph of an assortment of pills followed by the message, "You think that's enough?"

When cross-examining Waldrep, defense counsel questioned the surgeon about the photograph of the pills. Waldrep testified that he had not seen the exhibit before, that he did not know what the pills were, that there appeared to be at least two types of pills, and that there looked to be 40 to 50 pills shown. He also testified that if the pills were benzos,[7] a person ingesting them would be "pretty relaxed," and the pills would have a "pretty significant impact on your body and the way that it's functioning." On recross, defense counsel asked whether it would be safe to say that someone prescribed benzos was "having some sort of a mental episode," and Waldrep responded, "Yes, in general anxiety is mental."

Both parties questioned Waldrep as to why someone would be prescribed a benzo such as Xanax and what was meant by the term "mental." Defense counsel then asked, "[S]ince we're talking about benzos and the effects of people and talking about mental episodes, those

---

[7] Tammie later testified that the pills were in fact antidepressants and that she had not taken them.

33

types of things, okay, if you were to read this text string that was sent from the complainant –." The State objected and requested an in camera hearing.

The nature of the State's objection, defense counsel's intended question, and the trial court's ruling are unclear from the record. Defense counsel explained that he would "ask [Waldrep] if he prescribes prescriptions and those types of things, but is it possible that someone sending these types of text messages might be going through some sort of mental issue." The trial court cautioned that counsel could not get into the "specific text messages" or "read this text message and what they're saying" but could pose the question as a hypothetical. Counsel clarified, "So you're okay with me asking him about – not specifically about these text messages, but creating a hypothetical using, I guess, an analogy with the text messages and just ask him one brief question?" On the State's request, counsel provided the anticipated hypothetical: "if someone was to send a text message to you, Doctor, and there was a picture of a stack of pills, and they – the question below it said, 'Do you think this is enough,' would you in your medical opinion think that this person might be dealing with something mentally?" The State replied that it would not object if that were the extent of the question. Counsel's hypothetical following the resumption of cross-examination was substantively identical to the one proposed during the in camera hearing, and Waldrep testified that he could not answer because he did not know what was meant by "is that enough" or what the pills were.

First, from this record it does not appear that appellant's issue was preserved on appeal. To preserve a claim for appellate review, there must generally be a timely, specific objection that comports with the complaint on appeal as well as an adverse ruling from the trial court. *See* Tex. R. App. P. 33.1(a); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). Defense counsel seemingly intended to ask a hypothetical question initially and did not object to

34

the trial court's requirement that he do so; neither did counsel object—as appellant now argues on appeal—that his proposed hypothetical had been "stripped of any pertinent facts" and did not "mirror the facts of the case." The State, which vaguely objected to the direction of counsel's questioning, withdrew its objection after hearing the proposed hypothetical. Consequently, the trial court did not make an explicit ruling from which to appeal.

Even if the issue were preserved, we would not conclude that the trial court abused its discretion by limiting defense counsel's cross-examination. *Cantu*, 939 S.W.2d at 635; *Cruz–Escalante v. State*, 491 S.W.3d 857, 860 (Tex. App.—Houston [1st Dist.] 2016, no pet.) ("[W]e review a trial court's decision to limit cross-examination under an abuse-of-discretion standard."). "[T]he trial judge has wide discretion in limiting the scope and extent of cross-examination," *Hammer v. State*, 296 S.W.3d 555, 561 (Tex. Crim. App. 2009), and the defendant is not entitled to cross-examination that is effective in whatever way and to whatever extent he might wish, *Johnson v. State*, 490 S.W.3d 895, 909–10 (Tex. Crim. App. 2016). A trial judge may impose restrictions "based on such criteria as harassment, prejudice, confusion of the issues, the witness's safety, or interrogation that is repetitive or only marginally relevant." *Id.*

Defense counsel was allowed not only to ask in effect his desired question— whether it was possible that "someone sending these types of text messages might be going through some sort of mental issue"—but was allowed to reference the specific content of the texts in formulating the hypothetical. While he did not use Tammie's name in the question, such specificity would have been inappropriate—the question would no longer have been a hypothetical—and the identity of the messages' sender was nevertheless made clear to the jury

35

both from context and from counsel's original interrupted question. Thus, to the extent that counsel's cross-examination was limited, it was not an abuse of discretion.

Furthermore, any error would have been harmless. When asked about the texts, Tammie testified that "it's safe to say that [she] was having a bit of a mental episode on the morning of November 20th." She also testified that she had been prescribed Xanax for anxiety. Her sons similarly testified that she suffered from depression and anxiety and was dealing with "mental issues."

Accordingly, we overrule appellant's third issue.

## IV.    Burdens of Proof

In his fourth issue, appellant contends that the trial court erred by prohibiting defense counsel from cross-examining the grand-jury foreman about the "differing burdens of the grand jury and petit jury."

At trial, the State called the foreman of the grand jury that indicted appellant, Keith Brooks, who testified that the officers who presented evidence to the grand jury were uncertain of the manner and means by which Tammie's injuries were caused and that the indictment's language reflected this uncertainty. The following exchange concerning burdens of proof then occurred between defense counsel and Brooks:

Q. Okay.  [The State] mentioned that the burden of proof [to indict] is probable cause, correct?

A. Yes, sir.

Q. You – you weren't a part of my voir dire yesterday, but do you have any idea where probable cause ranks as far as the burden of proof goes?  Is it high on the burden of proof in order to prove a case, or is it fairly low, if you know?

36

A. If I know – I feel like – when I say I feel like – if we – if we believed it was enough evidence to bring it to trial, but we wasn't the ones doing the trying.

Q. Okay. If I was to tell you that probable cause is pretty low on the totem pole –

THE STATE: We're gonna object to counsel trying to testify about what the burden is, Judge.

THE COURT: I'm gonna sustain that objection. The discussion of the burden of the grand jury versus the burden of trial is not relevant here.

Appellant, citing *Payne v. State*, argues on appeal that when an indictment alleges that the object used to inflict injury on a complainant is unknown, the State must prove both that the object was unknown to the grand jury and that the grand jury exercised due diligence to ascertain its nature. *See* 487 S.W.2d 71, 72 (Tex. Crim. App. 1972). Because the State failed to perform its inquiry, appellant asserts, "defense counsel was entitled to ask the foreman of the standard of his investigation."

Appellant misstates the due-diligence rule, which originated over a century ago and was elaborated by the Court of Criminal Appeals with greater clarity in *Hicks v. State*:

> When an indictment alleges that the manner or means of inflicting the injury is unknown and the evidence at trial does not establish the type of weapon used, a prima facie showing is made that the weapon was unknown to the grand jury. *Matson v. State*, 819 S.W.2d 839, 847 (Tex. Crim. App. 1991). However, if the evidence at trial shows what object was used to inflict the injury, then the State must prove that the grand jury used due diligence in attempting to ascertain the weapon used.

860 S.W.2d 419, 424 (Tex. Crim. App. 1993) (en banc), *overruled by Sanchez v. State*, 376 S.W.3d 767, 772 (Tex. Crim. App. 2012). Under the rule, if the State failed to meet its burden, a fatal variance arose between the pleading and proof, requiring reversal. *Huffman v. State*, 775 S.W.2d 653, 661–62 (Tex. App.—El Paso 1989, pet. ref'd).

The due-diligence rule, however, "is no longer viable" in light of the Court's decision in *Malik v. State*, which held that a proper sufficiency review should compare the evidence at trial to a hypothetically-correct jury instruction rather than the indictment. *Rosales v. State*, 4 S.W.3d 228, 231 (Tex. Crim. App. 1999); *see Malik v. State*, 953 S.W.2d 234, 239 (Tex. Crim. App. 1997); *see also Sanchez*, 376 S.W.3d at 772; *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001); *Fagan v. State*, 89 S.W.3d 245, 249 (Tex. App.—Texarkana 2002, pet. ref'd) ("The rule requiring the state to show that the grand jury exercised due diligence in determining the instrumentality of the offense is no longer relevant to our analysis."). "*Malik* and *Hicks* are both rules for determining the sufficiency of the evidence." *Sanchez*, 376 S.W.3d at 772. Under the new rule:

> [s]o long as the essential elements of the crime charged have to be found by the jury in order for a guilty verdict to be returned, the State does not have to additionally and separately prove the good faith and due diligence of the grand jury in determining non-essential elements of the charge, such as what kind of weapon was used.

*Mireles v. State*, No. 13-02-00706-CR, 2005 WL 1492078, at *5 (Tex. App.—Corpus Christi–Edinburg June 23, 2005, pet. ref'd) (mem. op., not designated for publication) (citing *Malik*, 953 S.W.2d at 240).

Thus, because the State was not required to prove that the grand jury exercised due diligence in attempting to discover the object used to cause Tammie's injuries, the trial court did not abuse its discretion by not permitting defense counsel to cross-examine Brooks about the burdens of proof applicable to grand and petit juries.[8] We overrule appellant's fourth issue.

---

[8] Even were the due-diligence rule still in effect, a grand-jury foreman's understanding of differing burdens of proof would not be relevant to whether the grand jury exercised due diligence in ascertaining the identity of an object used to cause injury. *See* Tex. R. Evid. 401.

## V. Extraneous-Offense Evidence

In his fifth issue, appellant contends that the trial court erred by admitting "character evidence of [his] prior drug use, his prior treatment of Ms. Duffy, and his religious preferences under [article 38.371 of the Texas Code of Criminal Procedure] and Rule 403."

### A. Article 38.371

The nature of appellant's contention with respect to article 38.371 is difficult to construe. He argues:

> As previously discussed, the method and manner of Ms. Duffy's injuries could not be ascertained. Yet under [article] 38.371, the trial court allowed Ms. Duffy's testimony to further elucidate the jury in determining whether Mr. Gonzalez committed the offense. No method of the offense was alleged by the grand jury, yet multiple methods are hypothesized by the state's witnesses. Additionally, at least three types of character evidence of Mr. Gonzalez are admitted under [article] 38.371: his prior drug use, his alleged past violence toward Ms. Duffy, and Mr. Gonzalez'[s] veneration of the Santa Muert[e] statue. The admission of these facts under [article] 38.371 warrant a limiting instruction under Rule of Appellate Procedure 44.2(b). Tex. R. App. P. 44.2(b); *Rankin v. State*, 995 S.W.2d 210, 215 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd).

The first portion of the argument, which seemingly pertains to a perceived interplay between the admissibility of evidence under article 38.371 and the manner and means by which the offense was committed, was not preserved for appellate review. At trial, appellant objected that the extraneous-offense evidence was irrelevant and inadmissible under Rules 403 and 404(b) of the Rules of Evidence. "An objection stating one legal theory may not be used to support a different legal theory on appeal." *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995) (quoting *Johnson v. State*, 803 S.W.2d 272, 292 (Tex. Crim. App. 1990), *overruled on other grounds by Heitman v. State*, 815 S.W.2d 681, 685 n.6 (Tex. Crim. App. 1991)). Because appellant's complaint on appeal does not comport with his objections at trial, nothing is

39

presented for review. *See Williams v. State*, 191 S.W.3d 242, 255 (Tex. App.—Austin 2006, no pet.); *see Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009).

In the latter portion of his argument, appellant appears to assert that the trial court erred by not providing the jury with a limiting instruction at the time the extraneous-offense evidence was admitted. However, unlike the defendant in *Rankin*, appellant did not request a contemporaneous limiting instruction. *See* 995 S.W.2d at 215–16. Because he failed to do so, the extraneous-offense evidence was admitted for all purposes. *See Hammock v. State*, 46 S.W.3d 889, 895 (Tex. Crim. App. 2001); *Fears v. State*, 479 S.W.3d 315, 331 (Tex. App.—Corpus Christ–Edinburg 2015, pet. ref'd) (citing *Arrington v. State*, 451 S.W.3d 834, 842 (Tex. Crim. App. 2015)). Consequently, he has likewise not preserved error with respect to this argument. *See Thompson v. State*, No. 14-07-00374-CR, 2008 WL 2841675, at *2 (Tex. App.—Houston [14th Dist.] July 24, 2008, pet. ref'd) (mem. op., not designated for publication) ("[B]ecause appellant failed to request a contemporaneous limiting instruction at trial, he has not preserved error with respect to this argument.").

### B.      Rule 403

Appellant argues that the trial court abused its discretion by not conducting a separate Rule 403 balancing test for each extraneous offense:

> The issue of Mr. Gonzalez['s] alleged prior drug use is distinct from alleged violence toward Ms. Duffy, as are his religious preferences. The evidence does not establish the court individually considered these inflammatory subjects, as each are distinct and the differing basis for admitting each item are unique.

As with appellant's arguments under article 38.371, this argument was not raised in the trial court and is therefore not preserved on appeal. At trial, defense counsel made only a

general objection, asserting variously that the State's proffer was not admissible under Rule 403, that the evidence's "prejudicial value far – far outweighs any sort of probative value," and that "we've got a 403 objection to [evidence of appellant's drug use]." Appellant did not request that separate balancing tests be performed, nor did he object to the trial court's overruling his objections in a single ruling. Because the argument was not preserved, we will not address its merits.[9] *See Diruzzo v. State*, 581 S.W.3d 788, 797 (Tex. Crim. App. 2019) ("Preservation of error is a systemic requirement."); *Ford v. State*, 305 S.W.3d 530, 532 (Tex. Crim. App. 2009) ("If an issue has not been preserved for appeal, neither the court of appeals nor this Court should address the merits of that issue."). Accordingly, we overrule appellant's fifth issue.

## VI.  Tammie's Alleged Drug Use and Criminal History

In his sixth issue, appellant contends that the trial court erred by excluding evidence of Tammie's "substance use and arrests for DWI and family violence" under Texas Rule of Evidence 609. *See* Tex. R. Evid. 609.

Rule 609(a) provides that, when attacking the credibility of a witness, evidence of a prior criminal conviction shall be admitted only if (1) the crime was a felony or involved moral turpitude, (2) the probative value of the evidence outweighs its prejudicial effect to a party, and (3) it is elicited from the witness or established by public record. *Id.* R. 609(a); *Delk v. State*, 855 S.W.2d 700, 704 (Tex. Crim. App. 1993), *overruled on other grounds by Ex parte Moreno*, 245 S.W.3d 419, 425 & n.18 (Tex. Crim. App. 2008).

---

[9] Appellant offers no authority in support of his assertion that the trial court must conduct a discrete balancing test for evidence of each extraneous offense. Regardless, we cannot conclude from this record that the trial court did not do so, as the trial judge performed his analyses off the record. *See State v. Mechler*, 153 S.W.3d 435, 444 n.8 (Tex. Crim. App. 2005) (although "it is most helpful to reviewing courts," "a trial judge is not required to articulate his Rule 403 analysis on the record")

The Court of Criminal Appeals, however, established an exception to the rule[10] in *Ochoa v. State*, 481 S.W.2d 847, 850 (Tex. Crim. App. 1972). Where a witness "makes blanket statements concerning his exemplary conduct such as having never been arrested, charged or convicted of any offense, or having never been 'in trouble,' or purports to detail his convictions leaving the impression there are no others," "the State may refute such testimony despite the nature of the convi[c]tion used or its remoteness." *Id.*; *see Delk*, 855 S.W.2d at 704 (extending exception to Rule 609). The exception allows a party to "expose the falsehood" where a witness "creates a false impression of law abiding behavior," thereby opening the door "on his otherwise irrelevant past criminal behavior." *Delk*, 855 S.W.2d at 704. The Court further explained the rationale for the exception in *Hammett v. State*:

> Ordinarily the question of whether or not the accused has a criminal past or has otherwise been "in trouble" before is irrelevant to any material issue in the case, and hence, is collateral. Should the accused nevertheless falsely insinuate during his direct examination that he has never been "in trouble," the State may expose that falsehood just as it may any other falsely asserted collateral matter. The inference that is permissible from such exposure is that if the accused lied or was in error as to a collateral matter (especially one implicating his aptitude for getting in trouble with the law), he is likely to have lied or been in error in the balance of his testimony—those aspects of his testimony that are relevant to material issues in the case. This is a proper impeachment function.

713 S.W.2d 102, 105–06 (Tex. Crim. App. 1986) (en banc).

Here, Tammie's medical records—over 1,200 pages of which were admitted into evidence—included notations that she "reported drinking no alcohol" and "uses marijuana periodically" but "denies abusing any other drugs or alcohol." In a proffer during an in camera

---

[10] *Ochoa* concerned the statutory predecessor to Rule 609, former article 38.29 of the Texas Code of Criminal Procedure, which was repealed in 1986, when the rules of evidence first went into effect in criminal cases. *Leyba v. State*, 416 S.W.3d 563, 566 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

hearing, she testified that she had been arrested in 2017 for misdemeanor assault; that "[n]othing happened" with the case; and that she had been arrested a second time for DWI, for which she had a pending case. The State objected to the admission of evidence of her criminal history under Rules of Evidence 403, 404(b), and 609. Arguing against the objections, defense counsel asserted that the pending DWI case impeached Tammie's credibility because she had stated that she does not drink alcohol; that the assault arrest was relevant "to show that she's not this innocent angel that the State is painting a picture for;" and that "[i]f she's gonna sit here and make accusations against [his] client, then [he] ha[d] every right to cross-examine her as to her credibility."

First, as is evident from *Hammett* and other decisions from the Court of Criminal Appeals, the *Ochoa* exception requires that the impeachable statement be made during a witness' testimony. *See Ochoa*, 481 S.W.2d at 850 (explaining that when witness makes exemplary statements, State may "refute *such testimony*" through prior conviction (emphasis added)); *see also Delk*, 855 S.W.2d at 705 (examining "intonation" and "tenor" of inquiries on direct examination to determine whether question opened door to impeachment of witness); *Theus v. State*, 845 S.W.2d 874, 878 (Tex. Crim. App. 1992) (observing that exception applies when witness creates false impression of criminal history "during direct examination"); *Prescott v. State*, 744 S.W.2d 128, 131 (Tex. Crim. App. 1988) (finding that defendant's testimony that "this is [his] first time going through *this*" when responding to question about his attorney's decision to secure two statements on one day did not suggest he had never been subject of criminal proceeding); *Hammett*, 713 S.W.2d at 105 (describing rule that "when an accused *testifies* gratuitously as to some matter that is irrelevant or collateral to the proceeding, as with any other witness he may be impeached by a showing that he has lied or is in error as to that

43

matter" (emphasis added)); *Nelson v. State*, 503 S.W.2d 543, 545 (Tex. Crim. App. 1974) (noting that exception arises when "the witness, *by his direct testimony*, leaves a false impression of his 'trouble' with the police" (emphasis added)). Thus, because the purportedly impeachable statements in the present case were buried within over a thousand pages of exhibits, the exception is inapplicable.

Likewise, to the extent that appellant argues that defense counsel should have been allowed to cross-examine Tammie about her drug or alcohol use and criminal history and impeach her anticipated testimony, such a tactic has been expressly prohibited by the Court of Criminal Appeals:

> While great latitude is allowed in cross-examination in attempts to discredit the witness, the witness may not be cross-examined as to any fact that is collateral and irrelevant to the issue merely for the purpose of laying a predicate for the introduction of independent evidence to impeach him by a showing that, as to the matter embraced in the question, the witness has answered falsely.

*Hoffman v. State*, 514 S.W.2d 248, 252 (Tex. Crim. App. 1974) (citing *Corpus v. State*, 463 S.W.2d 4 (Tex. Crim. App. 1971)).

Moreover, even if the *Ochoa* exception could be used to impeach statements not made in testimony, Tammie's reported remarks to hospital staff did not concern the extent of her prior arrests, convictions, charges, or trouble with law enforcement. *See Theus*, 845 S.W.2d at 878. She stated only that she did not drink alcohol or abuse alcohol or a drug other than marijuana. Accordingly, the exception would not have applied to the statements in any event. We overrule appellant's sixth issue.

## VII.    Improper Lay Opinion

In his seventh issue, appellant contends that the trial court erred by "allowing Ms. Duffy to testify about why she cannot remember events of November 20, 2020, as this call[ed] for an expert medical opinion."

Rule of Evidence 701 provides that a lay witness' opinion must be "limited to one that is rationally based on the witness' perception and helpful to clearly understanding the witness' testimony or to determining a fact in issue." Tex. R. Evid. 701. "Perceptions refer to a witness's interpretation of information acquired through his or her own senses or experiences at the time of the event," *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002), and an opinion is rationally based on perceptions if it is one that a reasonable person could draw, *Fairow v. State*, 943 S.W.2d 895, 900 (Tex. Crim. App. 1997). There is no "distinct line" between lay and expert opinions. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). "As a general rule, observations that do not require significant expertise to interpret and which are not based on scientific theory can be admitted as lay opinions." *Davis v. State*, 313 S.W.3d 317, 349 (Tex. Crim. App. 2010). The admissibility of such testimony is within the discretion of the trial court and will not be reversed absent an abuse of discretion. *Id.*

Tammie testified that her memory "cut[] off" approximately 15 to 20 minutes after she took up to 15 Xanax pills and that during the interval, appellant verbally abused her and hit her on her head, face, and body with his fists. The following exchange then occurred:

> Q. As best you know – and I know you're not a doctor – but as best you know, do you know – or what is your opinion on why you can't remember anything after that 15 to 20 minutes?
>
> DEFENSE COUNSEL: I'm gonna object, Judge. She's not qualified to testify towards that.

45

THE COURT: Response?

THE STATE: She is qualified to give a lay opinion based on her own experience, and I think that she's more qualified than anybody, because this is her situation she went through, and she is entitled to give her opinion about her experiences.

DEFENSE COUNSEL: It's not a lay opinion she's asking for. She's asking for a medical opinion.

THE COURT: Objection, overruled.

. . . .

TAMMIE: I think that a lot of it's my brain blocking out the trauma.

Q. Do you think that the Xanax may play some role in it?

A. It could have.

Tammie was well-positioned to opine on her own memory loss. Her opinion was based on her perceptions, and she had personal knowledge of the events from which the opinion was drawn. She had earlier testified that one pill was enough for her to sleep and on cross-examination testified that Xanax was a "memory loss drug" and that she had taken five times her normal daily dose. The inference that her memory loss was caused by both ingesting so many pills and being punched in the head was one a reasonable person could have drawn. *See Fairow*, 943 S.W.2d at 900. For these reasons, the trial court did not abuse its discretion by overruling defense counsel's objection.

Even if the trial court's ruling were error, however, it was harmless. "Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove." *Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986); *see Sandoval v. State*, 409 S.W.3d 259, 289 (Tex. App.—Austin 2013, no pet.) ("Error in the admission of evidence may be rendered

46

harmless when substantially the same evidence is admitted elsewhere without objection."). As noted above, Tammie testified without objection that Xanax was a memory-loss drug and that "taking a lot of pills can mess with you mentally." Dr. Barrero testified that Xanax was a memory-loss drug; that "a victim testif[ying] that she does not have a lot of memory of some of the assault" would "be consistent with [his] lab results"; and that Tammie's having taken Xanax was "consistent with her testifying that she can't remember all of the assault." He also testified that memory loss could be caused by "other factors," such as "[b]eing knocked unconscious." Dr. Waldrep testified that "if the victim hypothetically cannot remember all of what happened to her, [that would] be consistent with her having taken benzos."

The SANEs, Hamilton and Bennett, both testified that Tammie's memory loss was likely caused by the alleged assault. Hamilton testified that Tammie was suffering from "trauma brain," which she explained was a "protective mechanism" by which a person experiencing trauma "shuts down the memory-making abilities of the brain." Bennett likewise testified that Tammie had trauma brain, that it explained her not remembering parts of the alleged assault, and that "[s]ome [victims] don't even remember the majority of the assault."

Accordingly, we overrule appellant's seventh issue.

## VIII. Patient-History Statements

In his eighth issue, appellant contends that the trial court erred by admitting "a nurse's statement of what Ms. Duffy told the nurse about her relationship with Mr. Gonzalez, after Ms. Duffy had previously testified about her relationship with Mr. Gonzalez." From appellant's briefing, we understand him to argue that Hamilton's testimony relating Tammie's statements about abuse in her relationship with appellant was inadmissible hearsay and that the

testimony was unnecessary or cumulative. The latter argument, however, was not made at trial and was therefore not preserved for appellate review. *See* Tex. R. App. P. 33.1(a); *Clark*, 365 S.W.3d at 339.

Defense counsel made the following objection after the State asked Hamilton about Tammie's disclosure of prior incidents of violence by appellant:

> Objection, Judge. She has no knowledge of that. If the [State] wanted to get into that, then Tammie was the witness to do that with. So, I don't think that she can get up there and talk about something that she should have gotten into with the complaining witness in this case. So, the expert has no knowledge of that.[11]

Hearsay is a statement, other than one made by the declarant while testifying at trial, that is offered to prove the truth of the matter asserted. Tex. R. Evid. 801(d); *Sandoval*, 409 S.W.3d at 281. Hearsay is inadmissible except as provided by statute or the rules of evidence. Tex. R. Evid. 802. One such exception is found in Rule of Evidence 803(4), which allows for the admission of statements that are made for—and are reasonably pertinent to—medical diagnosis or treatment and that describe medical history; past or present symptoms or sensations; their inception; or their general cause. *Id.* R. 803(4). To establish the exception, the proponent must show that:

> (1) the out-of-court declarant was aware that the statements were made for purposes of medical diagnosis or treatment, and that proper diagnosis or treatment

---

[11] It is arguable whether defense counsel's objection was to Hamilton's lack of personal knowledge or to the question's calling for hearsay. *See McIntyre v. State*, No. 14-13-00407-CR, 2014 WL 6602420, at *11 (Tex. App.—Houston [14th Dist.] Nov. 20, 2014, no pet.) (mem. op., not designated for publication) ("Rule 602 is often confused with Rules 801 and 802 regarding hearsay; however Rule 602 provides a separate basis for evidentiary objection." (citing 1 Edward J. Imwinkelried, *McCormick on Evidence* § 10, at 62 (7th ed. 2013) ("This [personal-knowledge] requirement can easily be confused with the rule barring the in-court repetition of out-of-court statements considered hearsay.")). On appeal, appellant does not assert that Hamilton lacked personal knowledge, and we will not address the matter.

depended upon the veracity of the statements, and (2) the statements are pertinent to diagnosis or treatment, that is, it was reasonable for the care provider to rely on the statements in diagnosing or treating the declarant.

*Faglie v. State*, No. 03-17-00281-CR, 2019 WL 847812, at *6 (Tex. App.—Austin Feb. 22, 2019, pet. ref'd) (mem. op., not designated for publication) (citing *Taylor v. State*, 268 S.W.3d 571, 588–89, 91 (Tex. Crim. App. 2008)).

"The essential 'qualification' expressed in the rule is that the declarant believe that the information he conveys will ultimately be utilized in diagnosis or treatment of a condition from which the declarant is suffering, so that his selfish motive for truthfulness can be trusted." *Taylor*, 268 S.W.3d at 587. Courts have repeatedly held that statements given to a SANE during a forensic examination can qualify for admission under Rule 803(4). *Leon v. State*, No. 03-19-00883-CR, 2021 WL 2149630, at *3 (Tex. App.—Austin May 27, 2021, no pet.) (mem. op., not designated for publication) (citing *San German-Reyes v. State*, No. 03-15-00432-CR, 2017 WL 2229873, at *11 (Tex. App.—Austin May 17, 2017, no pet.) (mem. op., not designated for publication); *Fahrni v. State*, 473 S.W.3d 486, 499 (Tex. App.— Texarkana 2015, pet. ref'd); *Franklin v. State*, 459 S.W.3d 670, 678 (Tex. App.—Texarkana 2015, pet. ref'd)); *see Zurita v. State*, Nos. 01-17-00274—00275-CR, 2018 WL 3625425, at *8 (Tex. App.—Houston [1st Dist.] July 31, 2018, no pet.) (mem. op., not designated for publication) ("Texas courts routinely admit testimony from sexual-assault nurse examiners under Rule 803(4).").

The record demonstrates that Tammie was aware of the importance of truthfulness and that her statements were made for purposes of medical diagnosis and treatment. "Unlike statements made to non-medical professionals, which require affirmative evidence in the

record on the issue of veracity, courts can infer from the record that the victim knew it was important to tell a SANE the truth in order to obtain medical treatment or diagnosis, particularly in the absence of evidence to the contrary." *San German-Reyes*, 2017 WL 2229873, at \*10. There is no evidence in the present case to rebut this inference. Moreover, her forensic interview was performed while she was still in the hospital after being moved out of the ICU. The Court of Criminal Appeals has recognized that in such a setting "it seems only natural to presume that adults . . . will have an implicit awareness that the doctor's questions are designed to elicit accurate information and that veracity will serve their best interest." *Taylor*, 268 S.W.3d at 589.

It is also evident from the record that Tammie's patient-history statements were relevant to her diagnosis and treatment. Hamilton testified that the forensic interview is "the most important part of a forensic exam, because that it what leads us, when we're looking at a victim." She explained that a detailed history allows the SANE to "try and get the information on what happened to the victim's body, what led up to the events that brought the victim into the hospital, and kind of brought them to us."

Her understanding of Tammie's relationship with appellant was particularly relevant. Hamilton testified at length about the challenges and demands of examining a victim of abuse or intimate-partner violence and explained that SANEs go through "specific training that relates to victims staying with abusers." She also testified that part of a SANE's responsibility is to work with abuse victims on an "escape plan" rather than telling them that they have to leave a relationship. Similarly, Bennett—another SANE who examined Tammie—testified that SANEs ask about patients' "social situation[s] to ensure their safety, in that [SANEs] can help facilitate a safe disposition outside of the hospital if [patients] need one." Bennett further testified that "[i]n the beginning of any forensic interview," SANEs "ask a standard [] four questions regarding

50

history of abuse" "to establish a baseline of what the patient may have gone through." Consistent with the purposes of a forensic interview, Hamilton testified that Tammie and appellant's relationship exhibited the signs of an abusive relationship and that Tammie's having filed an affidavit of non-prosecution did not affect Hamilton's "medical evaluation" that she was an abuse victim.

Accordingly, the trial court did not abuse its discretion by finding that the challenged statements fell within the Rule 803(4) exception to the prohibition against hearsay. *See Gutierrez v. State*, No. 03-21-00627-CR, 2023 WL 5622098, at *8 (Tex. App.—Austin Aug. 31, 2023, no pet.) (mem. op., not designated for publication) (holding that trial court did not abuse its discretion because "questions about fear, threats, and coercion help assess what resources might be needed for safety planning and mental-health treatment" and because "threats and comments about the patient's fear helped [the SANE] develop a safety plan to provide for future physical and mental health"); *Fahrni*, 473 S.W.3d at 499 (concluding "that it is at least within the zone of reasonable disagreement that the history was taken for the purpose of medical treatment or diagnosis").

Regardless, even were the admission of Tammie's patient-history statements error, it was harmless because substantially the same evidence was admitted elsewhere without objection. *See Leday*, 983 S.W.2d at 717; *Sandoval*, 409 S.W.3d at 289. Defense counsel objected to the State's asking Hamilton what Tammie told her "about previous incidents of violence that [appellant] had committed towards her." After the trial court overruled the objection, Hamilton testified that Tammie had stated that appellant had hit her in the face, emotionally abused her, and called her names; that she had not tried to leave him; that he had deleted the contacts in her phone; and that she was concerned that appellant had a way of

51

tracking her. However, Bennett later testified without objection that Tammie had told her that she was only allowed to have contact with family; that the contacts in Tammie's phone were deleted; that "she was not allowed to leave the house, so she would be assaulted"; that "[p]art of intimate partner violence is secluding the person and not allowing them to have interaction with other people"; and that she had mentioned that appellant had tracked her before.

For these reasons, we overrule appellant's eighth issue.

## IX. Neighbor's Testimony

In his ninth issue, appellant contends that the trial court erred by allowing the State to question his neighbor, Teresa Padilla, about items recovered from appellant's apartment.

Padilla testified without objection that she was not aware that law enforcement had recovered broken items from inside the apartment. However, when the State asked, "And are you aware that law enforcement recovered—," defense counsel objected:

> DEFENSE COUNSEL: Judge, that is leading. [The State]'s just offering evidence. Ms. Padilla said that she didn't hear anything, and she didn't hear a fight. She didn't hear anything broken. The State is just using this as an opportunity to offer in evidence.
>
> THE COURT: Your response?
>
> THE STATE: Your Honor, I'm gonna call the – the law enforcement officers to testify about what they recovered. I think it's a fair line of question to ask Ms. Padilla if she heard things related to what was recovered in the house.
>
> DEFENSE COUNSEL: Which she responded to my question and she didn't hear anything. It's very clear, Judge.
>
> . . . .
>
> THE STATE: I will proffer to you that the law enforcement officers are going to testify about the things that were recovered in the house. I think it's fair to ask her questions about whether or not she heard anything related to what was actually physically recovered there.

THE COURT: All right.  Objection is overruled.  You may continue.

The State then asked whether Padilla was aware that officers had recovered "segments of the woman's hair at various locations inside the residence," and defense counsel again objected that "[t]here's no way she would know that."  The trial court overruled the objection, and Padilla testified that she "did not know any of that."

On appeal, appellant argues that "[b]ecause [Padilla] had no personal knowledge of the law enforcement investigation, and did not hear anything else, the trial court erred in allowing repeated questioning by the state into these matters."

We need not address whether the trial court erred by admitting the testimony because we conclude that any error was harmless.  We do not see—nor does appellant explain—how Padilla's testimony that she was unaware of what officers seized from his apartment following the alleged assault had a substantial or injurious effect on the jury's verdict.  *See King*, 953 S.W.2d at 271.  Indeed, the testimony appears at worst irrelevant to any material issue, and appellant asserts only that "[b]ecause Ms. Padilla's testimony may have contributed to the jury's verdict, the case should be reversed and remanded to the trial court for further consideration of this point of error."  In light of the ample evidence of appellant's guilt, discussed above, we are confident that the challenged testimony—if erroneously admitted—did not influence the jury or had but a slight effect.  *See Motilla*, 78 S.W.3d at 355.  We overrule appellant's ninth issue.

## X.     Search-and-Seizure

In his tenth issue, appellant contends that the trial court erred by admitting evidence of items seized from a dumpster outside of his apartment.  Although he asserts that the court erred by allowing officers to testify about the items in violation of his Fourth Amendment

53

rights, it is clear from his briefing that he in fact challenges the search of the dumpster and the seizure of its contents. He argues that although officers had a warrant, it did not extend to the dumpster, and the items could not have been seized pursuant to the Amendment's "plain view" exception. *See Walter v. United States*, 447 U.S. 649, 657 (1980).

Appellant's claim is not preserved for appellate review. He did not file a motion to suppress or otherwise object to the evidence's admission on Fourth Amendment grounds.[12] *See Proenza v. State*, 541 S.W.3d 786, 808 (Tex. Crim. App. 2017) ("Almost all error—even constitutional error—may be forfeited if the appellant fails to object."); *Hooper v. State*, 106 S.W.3d 270, 273 (Tex. App.—Austin 2003, no pet.) (explaining that counsel must object even to "incurable" or "constitutional" errors to preserve them on appeal); *Perez v. State*, No. 06-21-00131-CR, 2022 WL 3452407, at *4 (Tex. App.—Texarkana Aug. 18, 2022, no pet.) (mem. op., not designated for publication) ("The preservation requirement applies to challenges asserted under the Fourth Amendment." (citing *Butler v. State*, 300 S.W.3d 474, 480–81 (Tex. App.—Texarkana 2009, pet. ref'd))). Thus, we overrule his tenth issue.

## XI. Jail Call

In his eleventh issue, appellant contends that the trial court erred by admitting a recording of a July 3, 2021 jail call between him and Tammie because it "occurred over seven months after the assault and constituted inadmissible character evidence under Rules 403 [and] 404." Appellant also appears to contend that the recording was irrelevant because "there was no connection established between the call and a fact more or less likely."

---

[12] At trial, appellant objected only that the evidence was irrelevant and that its probative value was substantially outweighed by a danger of unfair prejudice. *See* Tex. R. Evid. 401–03.

We have transcribed the call for purposes of this opinion:

Tammie: But I tell you, Daniela and your brother are going down for this shit just as much as you are. Because I have memories of them being there. You can say all you want—

Appellant: Well, you've got a fucking crazy memory 'cause Daniela and my brother were not there. That's the [inaudible]. And I know everything that happened. I know everything that happened. I know everything that happened. Everything.

Tammie: Yeah, they were there.

Appellant: And you know what? I don't regret shit. I'll tell you that right now over this recorded phone. I don't regret not a goddamn thing. You know that? Nothing. Nothing at all.

Tammie: Yeah?

Appellant: Nothing.

Tammie: You don't regret shoving my hair down my throat?

Appellant: I don't regret shit. Nothing. Nothing at all. And they can shove this recording up their fucking ass. I don't regret shit.

Tammie: You don't regret kicking me in the gut with your steel-toed boot, busting that vein?

Appellant: I don't regret shit, fat bitch. I don't regret shit.

First, with respect to appellant's contention that the recording was "inadmissible character evidence" under Rule 404(b), we note that other than mentioning the rule in the issue's title, the claim was not briefed on appeal. *See* Tex. R. App. P. 38.1(i) (requiring brief to contain "a clear and concise argument for the contentions made"); *Lucio v. State*, 351 S.W.3d 878, 898 (Tex. Crim. App. 2011) (holding that appellant's point of error was "inadequately briefed and presents nothing for review as this Court is under no obligation to make appellant's arguments for her"). Moreover, such an argument is meritless. Rule 404(b) pertains to extraneous offenses;

55

"[c]rimes or bad acts that are charged in the indictment are not extraneous and are not subject to exclusion under Rule 404." *Hall v. State*, No. 01-15-00870-CR, 2016 WL 3748733, at *2 (Tex. App.—Houston [1st Dist.] July 12, 2016, no pet.) (mem. op., not designated for publication) (citing Tex. R. Evid. 404(b); *Segundo v. State*, 270 S.W.3d 79, 87 (Tex. Crim. App. 2008)). Because the acts referenced in the jail call are precisely those that occurred as part of the indicted assault, they are not covered by Rule 404(b). *See* Tex. R. Evid. 404(b)(2); *Fischer v. State*, 237 S.W.3d 897, 898 (Tex. App.—San Antonio 2007, no pet.) ("By its terms, Rule 404(b) does not apply to evidence that arises in the 'same transaction' as the charged offense.").

Second, the record directly refutes appellant's assertions that "the state did not make a direct or logical connection between the call and the offense" and that "there was no connection established between the call and a fact more or less likely." *See* Tex. R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence, and the fact is of consequence in determining the action."). As the State explained during the in camera hearing on the recording's admissibility, appellant is "admitting virtually to this offense that he's alleged to have done." Although defense counsel attempted to draw a specious distinction between an "admission" and appellant's repeated professions that he regretted nothing in response to Tammie's detailing the constituent acts of the charged assault, appellant's statements are tantamount to a confession. His consciousness of guilt is likewise evident in his statements, "I'll tell you that right now over this recorded phone," and, "[T]hey can shove this recording up their fucking ass." To the extent that appellant argues that he and Tammie were discussing a different assault, there is no evidence in the record of any other incident of abuse in which he shoved hair down her throat, kicked her with a steel-toed boot, and severed the blood supply to her bowel.

Third, the evidence's probative value was not substantially outweighed by a danger of unfair prejudice. *See id.* R. 403. The inherent probative value of the recording was exceptionally high, as appellant could reasonably be inferred to be acknowledging his culpability for the charged offense. Similarly, the State's need for the evidence was great; appellant did not testify at trial and did not otherwise confess to the offense or admit criminal wrongdoing. There was little risk that the evidence would suggest a decision on an improper basis or confuse or distract the jury, as appellant's statements pertained exclusively to the indicted offense and directly rebutted the defense's principal theories. Nor was there a risk that the evidence would tend to be given undue weight because it was not scientific or technical and involved matters that could be easily comprehended by laypeople. *See Gaytan v. State*, 331 S.W.3d 218, 228 (Tex. App.—Austin 2011, pet. ref'd). Lastly, the evidence was not overly time-consuming or repetitive. The recording itself was only four minutes long, and testimony concerning the call constituted approximately eight pages of an approximately 1,000-page transcript. See *Robisheaux v. State*, 483 S.W.3d 205, 221 (Tex. App.—Austin 2016, pet. ref'd) (concluding that evidence did not consume "inordinate amount of time" where testimony was eight pages of record that was "hundreds of pages long").

Accordingly, the trial court did not abuse its discretion by admitting the recording. We overrule appellant's eleventh issue.

## XII. Law-of-Parties Instruction

In his twelfth issue, appellant contends that the trial court erred by instructing the jury on the law of parties "when there was no evidence at trial to substantiate that Mr. Gonzalez could be liable for the actions of another."

57

We review alleged jury-charge error in two steps: first, we determine whether error exists; if it does, we then evaluate whether sufficient harm resulted from the error to require reversal. *Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017), *superseded by statute on other grounds as recognized by Lopez v. State*, 600 S.W.3d 43, 46 (Tex. Crim. App. 2020); *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the jury-charge error was preserved in the trial court. *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018); *see Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth procedure for appellate review of claim of jury-charge error). Where, as here, the jury-charge error has been properly preserved by an objection or request for instruction, *see* Tex. Code Crim. Proc. arts. 36.14, .15, reversal is required if the appellant has suffered "some harm" from the error, which means the error "was calculated to injure the rights of the defendant." *Jordan v. State*, 593 S.W.3d 340, 346 (Tex. Crim. App. 2020); *see Almanza*, 686 S.W.2d at 171. In demonstrating that "some harm" occurred, a defendant must also show that he suffered some actual, rather than merely theoretical, harm from the error. *See Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). In assessing harm, we consider (1) the entire jury charge; (2) the state of the evidence, including contested issues and the weight of probative evidence; (3) the argument of counsel; and (4) any other relevant information revealed by the record as a whole. *Taylor v. State*, 332 S.W.3d 483, 489 (Tex. Crim. App. 2011); *Almanza*, 686 S.W.2d at 171.

The test for whether to submit a law-of-parties instruction to the jury was set forth in *McCuin v. State*, 505 S.W.2d 827 (Tex. Crim. App. 1974). *See Goff v. State*, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996); *see also Brown v. State*, 716 S.W.2d 939, 944 (Tex. Crim. App. 1986) ("The *McCuin* test is still a viable means for determining when a cause should be

submitted to the jury on the law of parties."); *Nunez v. State*, 215 S.W.3d 537, 543 (Tex. App.—Waco 2007, pet. ref'd) (applying *McCuin* test). In *McCuin*, the Court of Criminal Appeals explained:

> Where the evidence introduced upon the trial of the cause shows the active participation in the offense by two or more persons, the trial court should first remove from consideration the acts and conduct of the non-defendant actor. Then, if the evidence of the conduct of the defendant then on trial would be sufficient in and of itself, to sustain the conviction, no submission of the law of [parties] is required.

> On the other hand, if the evidence introduced upon the trial of the cause shows, or raises an issue, that the conduct of the defendant then upon trial is not sufficient, in and of itself, to sustain a conviction, the State's case rests upon the law of principals and is dependent, at least in part, upon the conduct of another. In such a case, the law of principals must be submitted and made applicable to the facts of the case.

505 S.W.2d at 830.

Alternatively, the Court has concluded that a law-of-parties instruction should be submitted "whenever there is sufficient evidence to support a jury verdict that the defendant is criminally responsible under the law of parties," *Ladd v. State*, 3 S.W.3d 547, 564 (Tex. Crim. App. 1999), or if the instruction has been requested by the State, and there is "some evidence in the record" for that theory of liability, *In re State ex rel. Weeks*, 391 S.W.3d 117, 125 (Tex. Crim. App. 2013).

Assuming without deciding that the trial court erred by instructing the jury on the law of parties, we conclude that appellant did not suffer "some harm" from the error. *See Jordan*, 593 S.W.3d at 346. As discussed above, there was abundant evidence that appellant was the principal actor in committing the charged assault. *See Ladd*, 3 S.W.3d at 565 ("[B]ecause there was no evidence tending to show appellant's guilt as a party, the jury almost certainly did

not rely upon the parties instruction in arriving at its verdict, but rather based the verdict on the evidence tending to show appellant's guilt as a principal actor."); *Cathey v. State*, 992 S.W.2d 460, 466 (Tex. Crim. App. 1999) (where "the evidence clearly supports a defendant's guilt as the primary actor, error in charging on the law of parties was harmless"); *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986) (same). Moreover, appellant fails to show actual harm, arguing only, "This is not harmless error, as the inclusion of this extraneous charge certainly likely [caused] jury confusion." *See Reeves*, 420 S.W.3d at 816. Thus, we overrule his twelfth issue.

## XIII. Improper Comment on Failure to Testify

In appellant's thirteenth issue, he contends that the trial court erred by allowing the State in its closing argument to comment on his decision not to testify at the punishment phase of trial.

A criminal defendant has a constitutional right not to testify.[13] U.S. Const. amend. V; *see* Tex. Code Crim. Proc. art. 38.08 (providing that defendant's failure to testify "shall not be taken as a circumstance against him, nor shall the same be alluded to or commented on by counsel in the cause"). Commenting on a defendant's failure to testify violates both state and federal law. *See Randolph v. State*, 353 S.W.3d 887, 891 (Tex. Crim. App. 2011). "The test for determining whether prosecutorial argument is a comment on a defendant's failure to testify 'is whether the language used was manifestly intended or was of such a character that the

---

[13] We will not review appellant's state constitutional claims because he fails to distinguish them from his federal claims. *See Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020); *Lagrone v. State*, 942 S.W.2d 602, 612 (Tex. Crim. App. 1997) (declining to address state constitutional claims where defendant did not distinguish them from federal claims or argue that Texas Constitution provides greater protections than United States Constitution).

jury would necessarily and naturally take it as a comment on the defendant's failure to testify.'" *Busby v. State*, 253 S.W.3d 661, 666 (Tex. Crim. App. 2008) (quoting *Cruz v. State*, 225 S.W.3d 546, 548 (Tex. Crim. App. 2007)); *see Kuhn v. State*, 393 S.W.3d 519, 542 (Tex. App.—Austin 2013, pet. ref'd). "It is not sufficient that the language used might impliedly or indirectly be so construed." *Busby*, 253 S.W.3d at 666. Rather, "the implication that the State referred to the defendant's failure to testify must be a clear and necessary one." *Randolph*, 353 S.W.3d at 891 (citing *Bustamante v. State*, 48 S.W.3d 761, 767 (Tex. Crim. App. 2001)). "In applying this standard, the context in which the comment was made must be analyzed to determine whether the language used was of such character." *Id.* We "must view the State's argument from the jury's standpoint and resolve any ambiguities in the language in favor of it being a permissible argument." *Id.*

"Where a defendant does not testify, a statement that he does not deserve leniency because he has not shown remorse may constitute an impermissible comment on the failure to testify." *Gonzalez v. State*, 616 S.W.3d 585, 594 (Tex. Crim. App. 2020) (citing *Randolph*, 353 S.W.3d at 892 ("[A] comment on the defendant's failure to show remorse is generally not proper if the defendant testifies at the guilt phase and presents some defense, but does not testify at the punishment phase.")). "Remorse" means "a deep, torturing sense of guilt felt for one's actions; the keen pain or anguish excited by a sense of guilt; compunction of conscience for an evil act committed; self-reproach." *Randolph*, 353 S.W.3d at 892. It is the feeling of sorrow or self-reproach, accompanied by guilt. *Id.*

During the punishment hearing, appellant's niece and sister testified as character witnesses for the defense. A.P. testified that appellant struggled with mental health issues when he was with Tammie, that he was never violent toward her, that he is a "different man today,"

61

and that his mental state has improved from when he dated her. Diana testified that she had only seen appellant be violent or vulgar when he was with Tammie; that he was in "a different place mentally," which had "to do with a lot of Tammie's influence on his life"; and that he had benefitted from medication.

Defense counsel emphasized their testimony during his closing argument, asserting that appellant was "a different man," "a changed man," and "a complete 180 now compared to when he was with Tammie." Counsel also asserted that appellant had done or said things that he regretted but that the "Michael that [the jury] knew . . . during the relationship with Tammie" was not "the real Michael."

In its closing argument, the prosecution made the following statement:

> Let's not judge [appellant] based on one day. Let's judge him based on every single thing he's done in the sum total of his life, and that's where we reach the point of saying, ask yourself, did you hear anything – anything – and we've been here a long time, and I know we're tired. Did you hear anything in all that time about one good thing Michael Gonzalez has done in the course of his life?

> Did you hear about him being remorseful for what he's done? You actually heard the opposite in the jail phone call, "I don't regret shit." Did you hear about his desire to change? You heard a lot from the Defense attorney saying, "Let's help him change, let's help him change." "Let's get him rehab, let's get him some therapy, let's get him counseling." But where do you ever hear –

Defense counsel objected that the State was commenting on appellant's decision not to testify, and the trial court overruled the objection.

The State then clarified:

> You heard from the two people in the world closest to the Defendant, sounds like, his sister and his niece, who have talked to him since he's been in jail every day. Did either one of them say he wants rehab? He wants treatment? No, you heard the exact opposite, which was it's all Tammie's fault. He hasn't really done anything wrong other than associate with Tammie.

The prosecution's comments must be viewed in the light of A.P.'s and Diana's testimony as well as defense counsel's closing argument. *See id.* at 891. The implication that the State was referring to appellant's failure to testify is neither clear nor necessary. Rather, the jury could have reasonably construed the statements as referring to appellant's failure "to present evidence other than from [his] own testimony," which "does not amount to [a] comment on [the] failure to testify." *Swallow v. State*, 829 S.W.2d 223, 225 (Tex. Crim. App. 1992); *see Patrick v. State*, 906 S.W.2d 481, 491 (Tex. Crim. App. 1995) (explaining that, if prosecutor's language can reasonably be construed to refer to defendant's failure to produce evidence other than his own testimony, comment is not improper). Indeed, in context it appears that the State was merely contrasting A.P. and Diana's testimony that appellant was a changed man—and defense counsel's statements that appellant regretted his actions and would benefit from treatment more than a lengthy sentence—with appellant's jail-call statements, A.P. and Diana's insinuations that Tammie had contributed to appellant's behavior, and the lack of witness testimony that appellant had expressed remorse.

As we explained in *Cooper v. State*:

> The State's reference to a defendant's failure to express remorse himself during the trial is a comment on the defendant's failure to testify. On the other hand, the State's reference to the defendant's failure to introduce evidence of remorse through other witnesses may be erroneous for other reasons but does not constitute a comment on the defendant's failure to testify.

959 S.W.2d 682, 686 (Tex. App.—Austin 1997, pet. ref'd) (internal citation omitted); *see Duff v. State*, Nos. 02-11-00241—00242-CR, -00249-CR, 2013 WL 1457833, at *4 (Tex. App.—Fort Worth Apr. 11, 2013, no pet.) (mem. op., not designated for publication) ("[W]hile a prosecutor's comment about a defendant's failure to testify violates the federal and state

constitutions, a closing argument that refers to the failure of a defendant's *witnesses* to testify about the defendant's remorse does not impermissibly comment on the defendant's failure to testify."). The challenged statements in this case appear to amount to the latter.

Moreover, "comments about the failure to testify are permissible if they are a 'fair response' to the defendant's claims or assertions" or "if evidence in the record supports the prosecutor's remarks." *Randolph*, 353 S.W.3d at 892; *see also Howard v. State*, 153 S.W.3d 382, 385–86 (Tex. Crim. App. 2004) ("[I]f there is evidence in the record supporting the comment, then no error is shown."). Here, the prosecution's remarks were a fair response to defense counsel's claim that appellant regretted his actions and were directly supported by appellant's own repeated assertions on the jail call that he regretted nothing.

Finally, even if the comments were error, any harm was minimal because the State immediately clarified that it had been referring to A.P.'s and Diana's testimony. *See Gonzalez*, 616 S.W.3d at 594 (determining any harm from comment was minimal where prosecutor "immediately clarified that she meant the reasonable inferences the jury could draw from [defendant]'s statements to the police, the expert witnesses who interviewed him, family members, and friends"); *Cooper*, 959 S.W.2d at 686 (concluding trial court and prosecutor cured any harm because court instructed jury to disregard comments, and "the prosecutor's continued argument revealed that he was not speaking to Cooper's absent testimony, but to the substance of the testimony presented through other witnesses during the guilt phase of trial").

For these reasons, we overrule appellant's thirteenth issue.

## CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment of conviction.

_____
Rosa Lopez Theofanis, Justice

Before Chief Justice Byrne, Justices Triana and Theofanis

Affirmed

Filed:   October 27, 2023

Do Not Publish